51079, Kingdom Fresh Produce, Inc. v. Stokes Law Office. First, Mr. Mandel. I believe this case is ripe for argument. Sorry, I couldn't help it. Trustee Sidekick, Your Honor. Good morning. If it pleases the Court, my name is Mark Mandel, and I am here representing the Stokes Law Office. And I'll start off, Your Honor, with an apology. Because I violated Joe Mandel's first rule of contract. And as a result, we have the C.H. Robinson v. Alenco case to deal with. Alenco lies at the basis of Judge Ezra's decision here. Having to do with whether you can use PACA trust assets to liquidate and collect the assets that are held in trust. This is especially important where, in the case before the Court now, the trustee, the PACA obligee, is defunct. Insolvent. That was not the case in Alenco. Alenco was just a court case. It had nothing to do with bankruptcy. There was no way, when the bankruptcy was filed, that the two debtors were in a position to collect the primary asset that they held in trust, which was the accounts receivable. They needed a way to do it. Following the Supreme Court's decision in Stern v. Marshall, the trustee can't do it. Because these are assets that are not part of the estate, and they're held for the benefit, not of the estate, but of a special group of creditors. The trustee's disqualified. Can't do it. But the PACA trust was designed, and its whole point was to get the maximum amount of money to the beneficiaries, the unpaid sellers, the growers, the other suppliers. Alenco, incidentally, I would have profited from knowing more about what happened these two-plus years and what Stokes accomplished for everybody. I read these briefs, and they give me all this law, and I know what the prior case is, but I don't know what Stokes did that was important to Kingdom as well as the debtors. Let's start off with Mr. Stokes as special PACA counsel for the debtor, rather than the debtor's counsel in bankruptcy. Collected $4 million. What is the difference between the PACA trustee, if there was one, or the bankruptcy trustee, and him being of counsel? What is the distinction? What was his role compared to possibly what a trustee for PACA or a trustee for the bankruptcy court case would be? He was this special counsel. It's this kind of a hybrid thing. Let's remember that under the PACA, the debtor, or let's call it basically the debtor trustee under the PACA, holds legal title to the assets that it holds in trust. His account's receivable. That's straight legal title. But he holds them in trust for his creditors. That's what it's all about. Now, if he can't collect it because he's defunct, he doesn't have any money. All these assets just have to be liquidated. Who's going to do it? Somebody has to do it. Money is just not going to magically appear in his bank account. So Mr. Stokes took on the obligation to do several things. First of all, in the initial orders, the PACA claimants and beneficiaries were required to submit claims to the court, which they did. It's a very simple procedure. Claims for what? Claims for how much they were owed and whether they were a beneficiary. PACA or the estate? Actually, they're both. They're actually both, and they have a super priority. So they have to be evaluated, and it can get technical at times. The debtor's records have to be consulted. The debtor's staff was actually paid with PACA funds to assist Mr. Stokes. Now, Stokes had to then get all the claims in, either file objections or deal with objections that one claimant against the other. He was kind of like a special master. Things that he couldn't resolve, he had to report to the court, and the court would then make some kind of determination on qualification, which the courts clearly had jurisdiction to do. And then once he gets all of that done, he's got to go out and collect those accounts receivable, because otherwise there's not going to be any money to pay anybody, including him. And he did that. $4.1 million. This was Chapter 11, wasn't it? It was, Your Honor. And he got a trustee over here. Can't do it. What's he going to do? Well, the trustee can't do it, because if you're going to follow Judge Ezra's reasoning, the trustee can't use PACA assets either. Builds them in trust. There's no effort to coordinate. Well, actually there was, Your Honor. There was a lot of back and forth. Stokes was appointed pursuant to the bankruptcy code provision, 327E, right? That was the application. The power of appointment comes from that bankruptcy code provision. Why shouldn't he be treated like any other 327E appointee? And it's not that he doesn't get any money, but he has to get in line with other 327E professionals who were hired through the bankruptcy court. Because he wasn't hired in the estate, Your Honor. But what basis is there other than that provision of the bankruptcy code to appoint him? Well, there is the order and the PACA beneficiaries' motion to appoint him specially. He was actually operating for them. We had two estates going on here. You had the debtor's estate, the traditional kind of thing, and then you had the PACA trust estate. And one could be administered with whatever assets were available, but the other one, there was nothing available to do it. So you have to be able to use it. Was there any objection raised to his appointment? No, none. Not only to his appointment, but to how he was going to be paid. They had notice of it. They appeared at the hearing. The attorneys and an attorney there said nothing. How long did he function? How long did he do his work? Two and a half years. I think they just made the last distribution a few months ago. Three years. The man did an outstanding job. For people who otherwise couldn't do it. I can't help but wonder why, in doing this, there's not some position or order by the bankruptcy judge. It would seem to me to be Stokes' endeavor is very much an interest of the bankruptcy judge. And he ordered it, Judge. The orders are in the record. What? The orders are in the record. Bankruptcy judge? Yes. Bankruptcy judge has approved his fees. He had to make applications. Okay, this helped me. It was all on notice. There were no secrets. He didn't just take some money and hold it. That was my mistake in Allen Co. Okay, that was my fault. This whole deal with Stokes that we're talking about. Right. Was also approved by order of the bankruptcy judge. Three of them, Your Honor. Three different bankruptcy judges. Judge Clark, Judge Ackert, and Judge Gargotta. Every one of them. Now, we brought to the court's attention the recent decision of the Supreme Court in wellness. That's the Wellness International Network versus Sharif. For a very particular reason. Judge Ezra, in his decision, appears to apply a concept of consent. That's very strict. The appellees did not sign anything. They didn't formally consent to Mr. Stokes' being retained. Didn't. And they waited eight months while he collected the $4 million. While he resolved claims objections, including their own. And brought an adversary proceeding. Two of them, as a matter of fact. XREL, the PACA trust. See, Mr. Stokes had to operate in the name of the debtors. Because it was a legal requirement. Otherwise, he couldn't sue anybody. He would have no legal authority. But he wasn't debtors counsel. He was really acting to help the beneficiaries of the trust. Exclusively. And your brief says his job was to work for the trust itself. So how is he any different than just a trustee? I mean, he has a separate name. But functionally, how is he different than a trustee? He's not. He is no different, Judge. How do you distinguish a Second Circuit case if he's a trustee, essentially? Well, I wasn't a trustee. I was a litigating lawyer, Judge. And I wasn't the trustee. I had a number of clients in the case. The C.H. Robinson counsel had a number of clients in the case. The third-party case, that account receivable arose out of. And my father's rule was that written agreements keep honest people honest. And I had an agreement, but I didn't put it in writing. Tell me exactly what this adversary proceeding was. The adversary proceeding, one was to collect an account receivable. The other one was against IBC, a bank that was holding a security interest in the debtor's property. Some of it being pure estate property, but others part of it being part of the Packer Trust case. That sounds like purely bankruptcy. Well, he brought on a declaratory judgment. You're saying this is an asset of the bankruptcy estate. It might be. It might not be. The claim against this bank. The claim against the bank was to determine. And here's not the bankruptcy trustee, but the Packer trustee bringing an adversary proceeding. Yes, Your Honor. Bringing an adversary proceeding to declare that part of the assets that were claimed by the bank. But again, the bankruptcy judge is overseeing this. Absolutely. This is a bankruptcy proceeding. Adversary proceeding in the bankruptcy. And that's when Judge Ackert said, you know what, boys? I want everybody to go to mediation. I want everybody there. Everybody's going to be represented by counsel in one form or another, or you're going to be there in person, and you're not going to waste our time. And that's what was done. How many companies were there under Packer that were owed money? I think it's something upwards of 80. 80? 80. A lot of them were pro se, Your Honor. Okay. Who objected to this besides Kingdom Fresh Produce to this appointment? Nobody. Who objected to Kingdom Fresh's claim? No, besides Kingdom Fresh, who objected to the appointment of Mr. Stokes? Nobody objected to the appointment. Not even Kingdom Fresh appointed to the objective. Didn't. It was not until the attorney's fee came. It was eight months later. Okay. Well, when they showed concern, did anyone else show concern besides them? Nobody objected to him. And nobody joined Kingdom Fresh either. And then they all signed express. Didn't a number of them sign consent forms after that point to give their. . . I mean, people can do what they want with their money. Yes, they did. It does seem to me at a minimum these people, once they get their proceeds from Packer, can agree to give it to Stokes. Of course they can. Or a charity, or go to Vegas with their money. It's their money. They've got to be careful because they're holding that money in trust for their creditors. There's a distribution chain. Well, the domino effect of a failure of a produce house is part of what brought the PACA Trust up front. It was one guy fails, and the next guy fails, and the next guy fails, and sooner or later you're going to get to, as the term was, from fork to farm. You're going to have a grower, a farmer, who can't get paid because this guy down the chain failed. And it was to protect the entire food chain and distribution. I see my time is up, and I'm sorry that I didn't have more. Mr. Keeton. May it please this honorable court, my name is Michael J. Keeton, and I have the great honor of representing Kingdom Fresh Produce, Iconic Company, Five Brothers Jalisco Produce, Rio Bravo Produce, and GR Produce. First off, I'd like to thank the court for the honor of appearing today. This is obviously a highlight in any attorney's career to argue a case this high, and certainly in mine. The issues that I see in this case boil down to two things. One is the debtors' belief that they found a better way. They found a better way than what Congress has in the statute. Right now, the statute says, don't touch PACA money until the beneficiaries are paid. Judge Ezra said that three times. I have three orders from Judge Ezra, 112 pages overall, of reasons why the belief that you found a better way to manage trust assets doesn't fly when the law is unambiguous. Congress specifically put trust assets outside the reach of a bankruptcy estate for one reason. They don't want administrative expense claims to gobble up non-estate property. You cannot use something, this circuit has said, the bankruptcy estate cannot benefit from something the bankruptcy estate does not own. But here's the bankruptcy judge sitting there agreeing to this. Well, there's a reason that judge isn't a judge anymore. Leif Clark authored the first opinion allowing this special master thing. What Judge Clark didn't take into consideration after some district topping, he ultimately lost his appointment as a judge because he didn't have a very good record for following the law, quite frankly. The fact is bankruptcy, rule of bankruptcy procedure 9031 is entitled, the title of the rule is no special masters in Title 11. That means no bankruptcy court, whether it's a Chapter 7 or Chapter 11, can have special masters. You can't do it. So then how is this money going to be collected and how is this work going to get done if you don't put somebody there to do it? Well, the same way it's been done since 1984. If it stays in the district court, you can have special masters, okay? No problem. The problem in this case is the debtor's attorney didn't understand, hey, now we're in bankruptcy court, and we're in bankruptcy court because you put them there. You wanted them to be in bankruptcy. This debtor's counsel, Mr. Stokes, was counsel for the defendants in the district court cases. The timeline on that is back in January of 2011, the district court cases were filed. This was voluntary or involuntary? Voluntary 11. So the debtor was getting sued. Delta Produce and Superior Tomato were getting sued for a year in district court. Mr. Stokes represented them both in the district court cases, represented the individuals that owned the companies, and fought off creditor claims for over a year. Then he gets together with debtor's counsel and says, hey, let's put them in bankruptcy. So he puts them in bankruptcy in January of 2011, so a year of district court litigation. After a year of district court litigation, they put them in bankruptcy. Then the PACA order gets entered in January of 2012, okay? That's when Mr. Stokes says, well, I was really working for the trust. The trust was my client. Even though 9031 says the trust can't be your client, okay? So then— Was Stokes representing the creditors? No, Stokes was representing the debtors and the principals of the debtors, who are kind of like guarantors. From the beginning. From the beginning, okay? And, you know, even before that. So then he comes in to the bankruptcy case and tries this special master routine. When we point out 9031 says you can't do that. And a bankruptcy judge, even— Did you point it out? Did you raise an objection and point it out that it could not be done? We did not file an objection to the retention order because it wasn't ripe at that time. Until—because bankruptcy claims, especially administrative expense claims, are unique in that there's an allowance procedure, and then there's a payment procedure. You can allow a claim. Even though there's no money to pay you, you can allow the claim to be allowed. So it's like you did the work. You should get paid. But you should get paid from your client. Your client was the bankruptcy estate. And what happened was after a year of representing his client as this, like, special master when you can't be a special master, he realized that two things. One is I can't be a special master, so I've got to find another way to get paid. And that's when he went to the debtor's attorney and said, no, the 327A counsel. That's the overall bankruptcy counsel. They have to do everything. Special counsel gets brought in under 327E for special things like antitrust matter or, you know, Med-Mal claim or something like that, where 327A is a bankruptcy specialist. He's not a trademark guy. So they bring in 327E special counsels, but they're counsels for the debtor's estate. They have to be retained and compensated under the bankruptcy code. You can't just, like, kind of make up this position of I was working for the trust. The trust is not a party in this case. The trust was never a party in this case. Who is your client? He kept morphing into basically he wore every hat in this case. I mean, he showed up at the mediation at one point saying that, well, first I was representing the debtors. Then I was representing the principals and the debtors. Then I was representing the trust. And then when that didn't work, I said, well, now I'm representing the PAC accreditors. So the very same PAC accreditors that you spent a year litigating against in district court, then you spent a year objecting to their claims to get paid under PACA, and now after you found out the estate is administratively insolvent and can't pay you on your administrative expense claim, that they don't have the money to pay you. So you'll get an allowed claim for fees. So are you saying you had no problem with him getting appointed? I had no problem with him getting appointed because the motion, contrary to what counsel just said up here, it's not true. I have the motion to retain Mr. Stokes. Nowhere in this motion is there any mention of the fact that he's going to be paid from PACA trust assets. Is there money in the bankruptcy estate? Because if he doesn't get the PACA trust funds, I mean, he'd be like any other professional under that provision. Sure, sure. Is there money in the estate? I don't know what's in there, but clearly not enough to pay him. All right, so he didn't like that idea. So he turned around and said, OK. And in fact, that's one thing I think Your Honor brought up was about these, you know, what we call, they call them consents. We call them circumvention agreements. Once Judge Ezra flipped the two fee orders, for good grounds, I mean, Judge Ezra is a bright guy. He knows his stuff. He dialed down on this, and he hit it on the head. It's like, you can't do this, not because I don't want you to get paid. I want you to get paid, but you wouldn't be the first 327E counsel on the planet to not actually get money. You'll get an allowed claim, but there might not be enough assets in the estate left to pay that claim. That's all. Nobody's saying you didn't do the work. Nobody's saying you didn't do a good job or whatever. What we're concerned about, and my clients are scared senseless about, is if you start approving the use of non-estate property to pay the estate's administrative expense claims, you're gutting the whole point of the packet trust. Congress put this money outside the reach of the Bankruptcy Court because, hey, we don't want you bankruptcy guys dipping into this money, so we're going to put it over here so 541D doesn't even cover it. It's non-estate property. In fact, there's a great case right out of this circuit, actually several of them. Borrego Springs in 2009, you can't surcharge a non-estate property for estate expenses. That was following the Seventh Circuit precedent saying the same thing. A matter of Holstein leasing in 1985 said the same thing. Georgia Pacific v. Sigma... Those are all in the brief? I'm sorry? Oh, yeah, those are all in the brief. Yep, they're all in the brief. I'm a big fan of like, you know, just read the briefs, and I'm sure you have. Now, Georgia Pacific even said, now in bankruptcy, debtors' sole permissible activity with regard to non-estate property is to turn it over to the beneficial owners. So since 1984, there's been a person to do what Mr. Stokes did in this case. The sky isn't going to fall. All these assets aren't going to just get wasted just because some debtor's attorney can't dip into non-estate property. What's going to happen is what happens in every case. It either stays in district court, and there's a special master appointed to do all this, or they put it into bankruptcy, and the first thing the 327A council does is say, look, which one of you creditors want to come in and, like, run this? And just hand it off to the creditors and then say, look, I can abandon that. Any trustee in bankruptcy or Chapter 11 debtors' council can abandon the asset if it's of inconsequential value to the estate, which non-estate property under a federal statute is. Are you saying that the order that the judge signed that set up the procedure did not say that Mr. Stokes was going to be paid out of PACA trust? Oh, that order did. That order, we objected to the order in an email to Mr. Stokes. We've laid out six reasons why this proposed order can't fly. Not only did he not respond to that, he submitted that agreed or draft order to the bankruptcy court and represented on the record that all the PACA creditors agree to this judge, when that's not the case at all. So you objected in an email to Mr. Stokes, not to the court? I objected in an email to Mr. Stokes. That's absolutely correct. And I said, listen, it's not an issue now. If you want to do this, you can't do it. The bankruptcy court can't do it. So if we need to flip it on appeal, we will. But you cannot do this. You cannot do this because, as a special master, 9031 blocks your way. You cannot do it. No bankruptcy judge can approve this. So it's instantly reversible on appeal. The second problem with it is, as a 327e payment, so at first he tried to get paid as this special master. That doesn't work because of 9031. And then he switched the timeline. On 227, the motion to retain him as 327e counsel was filed. On 327, the bankruptcy court granted that order. Now, only four and a half months later, he submitted his first fee application. So as much as counsel wants to come up here and say, well, he really worked for two and a half years and we didn't know anything about anything, the fact of the matter is, he was only in this position of 327e counsel for four and a half months before he filed a fee application, and we immediately objected to it. Did you object to that first fee request? Absolutely. Absolutely. Which raises an issue. You appealed the first . . . you appealed the two interim fee orders. Right. And it seems like those weren't appealable orders. Now, you can always get leave to appeal to the district court in a bankruptcy, but you didn't seek that, and the bankruptcy court didn't on its own say, I grant leave to appeal, and here's my big 50-page opinion. So how was there any appellate jurisdiction in the district court over the first two fees? As your Honor knows, appellate jurisdiction is a very, very liberal thing in bankruptcy. Bankruptcy appeals, because in the old days, it used to be referees. Do you have any cases saying it's this liberal, though, that it applies to this situation? It's . . . look at 158 . . . 28 U.S.C. 158A.3.C. Specifically says a notice of appeal can be taken by the district court, can be taken as a motion for leave to appeal, and by taking up the issues on appeal and actually biting down, the district court granted that motion and covered that in his 112 pages of reasons why you can't do this, Mr. Chairman. Even though he didn't say, I grant you leave to appeal. There was no indication he ever . . . because it's a discretionary decision. Even though it's not final, should I still address it because it will help speed things along? Can you point to any indication that the district judge exercised that discretion? Sure. He wrote 112 pages of opinion on that appeal. So he clearly took the appeal and granted it as a motion for leave to appeal. And on top of that, what we have is the two fee orders that were flipped the first time. Mr. Stokes then went back on a third fee application. At the time, he had two fee orders got vacated and reversed. He had a pending motion for reconsideration. Then he goes to the bankruptcy court and says, I still want more money. Can you give me more money? And the bankruptcy court said, okay, here's more money. Even though you've already been flipped on the first two fee orders. And at that hearing, the bankruptcy court asked him, he's like, listen, you're taking this money at your own peril. If Judge Ezra doesn't change his opinion, you might have to give this back. Are you prepared to do that? And he said, I'm prepared to do that, Your Honor. So he said, fine, then I have no problem. Give it to you. Because the second two bankruptcy court judges, they just didn't want to like change horses midstream. That was their kind of thing. They looked at it as like, listen, this isn't my order. You know, Judge Clark put this, you know, you in this position. I'm just going to sit here and let it ride. And if I get reversed on the third one, so be it. You said you'd put the money back. So there's no harm to you guys, kingdom fresh. So here's the money. The first thing Mr. Stokes did, even though there was clearly an interested party with a disputed right to that money. First thing Mr. Stokes did was disperse that money to himself personally. And then he deposited it into his 401k account, exempt from judicial process. So you wouldn't be adding a little bit here that's not in the record, would you? That's true. That has to be addressed down the road. But bottom line is, there's a lot wrong here. Mr. Stokes came in in this created position that there is absolutely no legal basis for. And there's actually a bankruptcy rule directly on point saying you can't possibly be this. But you can, but you can't get paid out of this money. No, no. Early on, he said he was a special master. I didn't work for the debtor. I didn't work for the estate. I didn't work for the court. He said he represented the trust itself. So he created this position. And he even said in one of his briefs, he said he was trying to be innovative. And Judge Ezra just kind of like had a very good point. And it's like, look, if you want to be innovative, if you want to change the law, go talk to your congressman. There's 535 members of Congress that change laws. You don't come to a court asking us to change the law to make it easier to administer. In fact, there's a . . . How does your appeal on the fees, it looks to me like what, against . . . On one of the debtors, you have 7% of the pocket claims and 8% or so against the other one. How can you appeal more than that 7% or 8% of the attorney's fees when everyone else is fine with giving Stokes those funds? Well, they're not fine. If you actually read these circumvention orders, I call them, or circumvention agreements, Mr. Stokes is holding on to probably about 60, 70 cents on the dollar of undisputed money. Now, he went out to the PAC accreditors in this letter and he said, look, if you don't sign this agreement that basically says you won't object to my third fee application, if you don't sign this, I'm not going to disperse, and I'm going to tie up your money for another two or three years with appeals. So it's basically negotiation by hostage taking, in my opinion. It's like, I'm not going to disperse the undisputed portion of your money unless you agree that I can get paid despite what the courts say. But whatever the reason, since they're not appealing the fee, how is any more than your 7% or 8% at stake? Oh, what's at stake here is the violations of the law. I mean, my client is over and over and over again in these cases. If you win on that, how do we award more than 7% or 8% of the money? Well, the best thing I think the court can do is, and I think it's almost the tail wagging the dog at that point, is take the conflict issue, because there were clearly conflicts. He went into that mediation actively soliciting creditors to be their attorneys when he's still representing the debtor. So it's like, now you're representing the debtor. You previously represented the principals, and you're currently representing creditors. He represented everyone in that room except the bank. It's like, at the same time, that's a conflict. Did he represent your client? I'm sorry? Did he represent your client? No, of course not. Did you benefit from his work? No, actually he objected to our claim. We spent money overcoming his objections to our claim. Now he wants us to pay him for fighting against us. Now, what's interesting is his first fee application, he wasn't appointed until 327 as 327E counsel. His first fee application covered all the way back to January of 2012. So he's trying to get paid through a fee application as 327E counsel for work three and a half months prior to him even getting appointed as 327E counsel. So not only is there no benefit to this, we had to pay, or the clients had to pay me, to defend against his objections to our claims. So how can you sit there and fight against the PAC accreditors for, let's see, he was on the job four and a half months before his first fee application, and our written objections came in at that time. Because now he's asking for payment from the trust account that Congress said, look, you cannot touch this money to pay administrative expense claims. You just can't. So that was when it first crystallized into an issue that we could take to the district court and say, I was fearful of this, but when he wants to be retained as a state counsel, fine. When he wants to be paid from estate funds only, which his affidavit clearly said, his affidavit, which is crystal clear, he said, look, neither I That's fine, Mr. Keaton, your time's up. Oh, I'm sorry. Thank you, Your Honors. Mr. Mandel, five minutes. Thank you, Your Honor. First, let's correct a few errors of counsel. The district court case that he's referring to were pending for one month, not one year. They were filed December 8, 2011, and the bankruptcy was filed in January of 2012. One month, not one year. Second of all, Mr. Stokes never represented the principals. Never. At the mediation hearing that you were discussing, everybody had their own counsel. Randy Pullman, an attorney, represented the principal, the bank had its attorney, and the debtors' counsel, Langley and Barak, who was the debtors' counsel throughout the matter, was there. The bank had its counsel. In the mediation order, the court directed that all the PACA beneficiaries had to be there and be prepared to mediate. The idea was to settle it. What judge are we talking about now? Eckert. Eckert. I'm sorry. And the fee order was—or not the fee order, but the mediation order was very specific. And then Mr. Stokes was obligated to send that out to everybody.  Now, that was no conflict, because he already functionally represented them, represented their interests in the trust. He was not technically a special master. There's no violation under the bankruptcy rules. Well, now, what does Judge Eckert say, or do we know, what were his orders with respect to where that money is going to come from to pay Stokes? Pay Stokes? He said it would be paid out of the PACA trust funds. And there was no appeal on that taken. More importantly, counsel mentioned, hey, this is something you've got to do in the district court. So he was served with the order saying that Mr. Stokes was going to have to be paid out of the trust. Counsel knew full well that the PACA trust assets can't be used to administer the estate. He has a very powerful remedy. Withdraw the reference. Take it up to the district court, even though he consented to it before. Put the whole thing back in the district court right then and there. Not wait seven, eight, nine months, a year. Right then, right now, before Stokes does a thing. And then we'll see how the district court wants to handle it. There was no appeal from that order either. And he had plenty of time to appeal that order. And Mr. Keaton's associate filed a notice of appearance. Mr. Kelly, on behalf of all the appellees here, they did nothing about that order. And they knew full well that if they didn't do something about it, that Stokes was going to be paid from the trust. And they did nothing. They lie. They'll go. That's the same. They were waiting out in the weeds to file their objections. Did any of Mr. Stokes' work benefit? Absolutely. They got their beneficial distributions the same as everybody else did. Okay? The objection situation was something of a mess because while Mr. Stokes may have accepted or objected to claims, other people could file, other beneficiaries could file objections to each other. These people were all adverse to one another. You know, if you're looking for conflicts, all the PACA beneficiaries were adverse to each other in that sense because when an objection to one claim was sustained, distribution to the next guy went up. That's how it works. Stokes did not submit the order that retained him. That's wrong. The creditors did. The motion that counsel talks about was filed not by Mr. Stokes. It was filed by debtors' counsel, Langley and Barak, and then it was drafted by another attorney, another PACA attorney, for other creditors. They were all involved. They were looking for a way to get the funds collected. That's all. There were... Thank you, Mr. Mando. Thank you, Judge. Time's up. The court will study this matter, reach a decision, and decide whether this was a rotten deal or not. I'm sorry.